**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EQT PRODUCTION COMPANY,     )
        )
     Plaintiff,     )
        )     Civil Action No. 14-1053
     v.     )
        )     Judge Nora Barry Fischer
TERRA SERVICES, LLC,     )
        )
     Defendant     )

## MEMORANDUM OPINION

## I.    INTRODUCTION

This is an action in which Plaintiff EQT Production Company ("EQT") seeks to recover from Defendant Terra Services ("Terra") for damages stemming from leaks in a natural gas well site operated by EQT and constructed, in part, by Terra. Presently before the Court is Terra's Motion for Partial Summary Judgment as to EQT's Claim for Attorneys' Fees and Terra's Motion for Partial Summary Judgment as to EQT's Civil Penalty Claim. (Docket Nos. 262, 266). After careful consideration of the parties' positions, and for the following reasons, Terra's motions will be DENIED.

## II.    FACTUAL BACKGROUND

### A. Terra's Motion for Partial Summary Judgment as to EQT's Claim for Attorneys' Fees

The following facts are not contested with respect to Terra's Motion for Partial Summary Judgment as to EQT's claim for attorneys' fees. EQT owns and operates a natural gas well facility known as the S-Pad, which until June 2013 included an impoundment ("S-Pit"), located in Duncan Township, Tioga County, Pennsylvania. (Docket No. 270 at ¶ 1; Docket No. 288 at ¶ 1). EQT's

1

ESCGP-1 permit application indicated that the S-Pit would be used to store freshwater. (Docket No. 270 at ¶ 2; Docket No. 288 at ¶ 2). EQT began storing flowback and produced water in the S-Pit on or around December 20, 2011. (Docket No. 270 at ¶ 3; Docket No. 288 at ¶ 3).

EQT constructed the S-Pit during October and November 2011. (Docket No. 288 at ¶ 1; Docket No. 294 at ¶ 1). On or about November 4, 2011, Environmental Construction, Inc. supplied and installed a 40-mil linear low density polyethylene liner in the S-Pit. (Docket No. 288 at ¶ 2; Docket No. 294 at ¶ 2). On December 21, 2011, EQT signed a Master Services Agreement ("MSA") with Terra to treat the water in accordance with the terms of the same. (Docket No. 270 at ¶ 4; Docket No. 288 at ¶ 4). Pursuant to the MSA, Terra agreed "to furnish its best skill and judgment when discharging its obligations" and "to complete the Work in a good, workmanlike, safe, expeditious and economical manner, free from defects." (Docket No. 270 at ¶ 5; Docket No. 288 at ¶ 5; Docket 274 at § 9.1). The MSA further provides that Terra "shall not cause or permit a violation of, or perform Project Work in a manner that will subject the Project site to any remedial obligation under any local, state or federal environmental laws" and that Terra "shall indemnify and hold [EQT] harmless from any costs or damages caused by any breach by [Terra] of this Article, including, but not limited to, citations, penalties or fines from any applicable governmental authority." (Docket No. 270 at ¶ 6; Docket No. 288 at ¶ 6; Docket 274 at § 14.1).

As to attorneys' fees, the MSA states that "[Terra] shall be liable to [EQT] for all costs incurred as a result of accelerated or expedited methods in order the meet the original schedule completion dates, or otherwise mitigate any delay caused by such default and all legal fees and additional expenses incurred as a result of [Terra's] default." (Docket No. 270 at ¶ 7; Docket No. 288 at ¶ 7; Docket 274 at § 6.2.4). The MSA also provides that "[Terra] shall defend, indemnify,

and hold harmless [EQT] . . . from and against any and all claims, . . . including attorneys' fees and other costs of defense." (Docket No. 270 at ¶ 8; Docket No. 288 at ¶ 8; Docket 274 at § 6.2.4). Pursuant to the MSA, "[i]n the event [Terra] or its insurance carrier defaults on any obligation under this Schedule A or the policies required by this Schedule A, [Terra] agrees that it will be liable for all reasonable expense and attorneys' fees incurred to enforce the provisions of this Schedule A or of the policies." (Docket No. 270 at ¶ 9; Docket No. 288 at ¶ 9; Docket 274, Schedule A at ¶ 8). There is no reference to Sections 6.2.4 and 12.2 or to Paragraph 8 of the MSA's Schedule A in EQT's Complaint. (Docket No. 270 at ¶¶ 7-9; Docket No. 288 at ¶¶ 7-9).

At certain dates and times between April 19, 2012 and April 24, 2012, Terra performed water treatment services at the S-Pit. (Docket No. 270 at ¶ 10; Docket No. 288 at ¶ 10). Terra recognizes the importance of protecting the integrity of water impoundment liners and admits that its work at the S-Pit preceded EQT's discovery of holes in the liner. (Docket No. 288 at ¶¶ 7-9; Docket No. 294 at ¶¶ 7-9). Terra also admits that the holes in the S-Pit liner caused some leakage of impaired fluids from the S-Pit into surrounding land and water. (Docket No. 288 at ¶ 10; Docket No. 294 at ¶ 10).

In July 2014, EQT filed a Complaint against Terra for breach of contract, breach of express warranty, contractual indemnification, and, in the alternative, common law indemnification. (Docket No. 270 at ¶ 11; Docket No. 288 at ¶ 11). EQT has alleged that Terra violated the MSA by failing to use its best skill and judgment in discharging its obligations; failing to complete its water treatment work in a good workmanlike, safe, expeditious, and economic manner; failing to use the skill and judgment customarily used in its trade in performing its water treatment work and to complete it free from defects; improperly causing the S-Pit to sustain several hundred holes; and

causing or permitting a violation of, or performing its water treatment work in a manner that subjected the well to remedial obligation under local, state, and/or federal environmental laws. (Docket No. 288 at ¶ 11; Docket No. 294 at ¶ 11).  EQT seeks contractual and common law indemnification from Terra.  (Docket No. 270 at ¶¶ 12-13; Docket No. 288 at ¶¶ 12-13).  EQT's Complaint and its "wherefore" clause do not include the words "attorneys' fees."  (Docket No. 270 at ¶ 14; Docket No. 288 at ¶ 14).

EQT served two expert reports addressing attorneys' fees as an element of EQT's damages. (Docket No. 270 at ¶ 15; Docket No. 288 at ¶ 15).  William Krieger's report tabulated attorneys' fees for three different law firms as damages.  (Docket No. 270 at ¶ 16; Docket No. 288 at ¶ 16). Mark Shepard's report opined that the attorneys' fees incurred by EQT were appropriate and reasonable, but it does not evaluate whether EQT is legally entitled to recover attorneys' fees. (Docket No. 270 at ¶¶ 17-18; Docket No. 288 at ¶¶ 17-18).

On or about October 7, 2014, the Department of Environmental Protection ("DEP") filed a complaint with the Environmental Hearing Board ("EHB") for civil penalties against EQT for violations of the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1-691.1001 and Pa. Code § 91.34 (the "EHB Proceeding").  (Docket No. 288 at ¶ 12; Docket No. 294 at ¶ 12).  The violations alleged by the DEP were based, in part, upon the contamination caused by the leakage of fluid from the S-Pit.  (Docket No. 288 at ¶ 13; Docket No. 294 at ¶ 13).  On May 26, 2017, after a ten-day hearing, the EHB issued a written adjudication assessing a civil penalty against EQT totaling $1,137,295.76.  (Docket No. 288 at ¶ 14; Docket No. 294 at ¶ 14).

EQT engaged the services of several law firms to assist with remediation efforts and in defense of the EHB Proceeding.  (Docket No. 288 at ¶ 15; Docket No. 294 at ¶ 15).  Babst Calland

Clements and Zomnir, P.C. ("Babst Calland") primarily represented EQT during the EHB Proceeding and when EQT sought declaratory relief with the Pennsylvania Commonwealth Court relating to the EHB Proceeding. (Docket No. 288 at ¶ 16; Docket No. 294 at ¶ 16). Exhibit B to Mr. Krieger's expert report identifies the cost of Babst Calland's representation of EQT through January 2017 as totaling $1,531,463. (Docket No. 288 at ¶ 17; Docket No. 294 at ¶ 17). Buchanan Ingersoll and Rooney, P.C. ("BI") and Duane Morris LLP ("Duane Morris") also provided legal advice to EQT. (Docket No. 288 at ¶¶ 18, 20; Docket No. 294 at ¶¶ 18, 20). Exhibit B to Mr. Krieger's expert report identifies the cost of BI's representation of EQT through January 2017 as totaling $121,997 and the cost of Duane Morris's representation of EQT through January 2017 as totaling $84,368, with a total cost for services to EQT amounting to $1,737,828. (Docket No. 288 at ¶¶ 19, 21-22; Docket No. 294 at ¶¶ 19, 21-22).

The EHB Proceeding is ongoing, and EQT will continue to incur attorneys' fees and costs associated with that litigation. (Docket No. 288 at ¶ 23; Docket No. 294 at ¶ 23). EQT is claiming as damages in this case the attorneys' fees it has and will incur in connection with its remediation efforts and in defending the EHB Proceedings. (Docket No. 288 at ¶ 24; Docket No. 294 at ¶ 24). EQT is not seeking its counsel fees incurred in connection with the instant action. (Docket No. 288 at ¶ 25; Docket No. 294 at ¶ 25). EQT put Terra on notice of its intent to seek legal fees and costs associated with its remediation efforts and the defense of the EHB Proceeding in June 2016 as part of its discovery responses. (Docket No. 288 at ¶ 26; Docket No. 294 at ¶ 26). On June 24, 2016, September 21, 2016, January 23, 2017, and February 10, 2017, EQT made document productions that included redacted summaries of its legal invoices purportedly relating to remediation and the EHB Proceeding. (Docket No. 288 at ¶ 27; Docket No. 294 at ¶ 27). Terra

deposed Mr. Krieger on March 31, 2017, and Mr. Shepard on April 21, 2017. (Docket No. 288 at ¶ 28; Docket No. 294 at ¶ 28).

### B.  Terra's Motion for Partial Summary Judgment as to EQT's Civil Penalty Claim

The following facts are not contested with respect to Terra's Motion for Partial Summary Judgment as to EQT's civil penalty claim. EQT owns and operates an S-Pad, which until June 2013 included the S-Pit located in Duncan Township, Tioga County, Pennsylvania. (Docket No. 268 at ¶ 1; Docket No. 291 at ¶ 1). The S-Pit had a usable volumetric capacity of approximately 5.2 million gallons. (Docket No. 268 at ¶ 2; Docket No. 291 at ¶ 2). The S-Pit occupied an area of approximately 80,825 square feet. (Docket No. 268 at ¶ 3; Docket No. 291 at ¶ 3).

EQT's ESCGP-1 permit application indicated that the S-Pit would be used to store freshwater. (Docket No. 268 at ¶ 4; Docket No. 291 at ¶ 4). EQT began storing flowback and produced water in the S-Pit on or around December 20, 2011. (Docket No. 268 at ¶ 5; Docket No. 291 at ¶ 5). EQT's water hauler, BEO, discharged more than 160,000 barrels (or 6,720,000 gallons) of impaired water into the S-Pit between December 2011 and May 2012. (Docket No. 268 at ¶ 6; Docket No. 291 at ¶ 6). On December 21, 2011, EQT signed the MSA with Terra to treat the water in the S-Pit in accordance with the terms of the agreement. (Docket No. 268 at ¶ 7; Docket No. 291 at ¶ 7). BEO made at least 1,454 separate discharges of impaired water into the S-Pit between December 2011 and May 2012. (Docket No. 268 at ¶ 8; Docket No. 291 at ¶ 8). BEO's discharge of impaired water to the S-Pit between December 2011 and May 2012 occurred at a time when EQT allowed water haulers to access the S-Pit at any time without an EQT representative present to observe the water haulers' operations. (Docket No. 268 at ¶ 9; Docket No. 291 at ¶ 9). EQT allowed BEO open access to the S-Pit at all hours of the day and night during

the period when BEO discharged impaired water into the S-Pit between December 2011 and May 2012.  (Docket No. 268 at ¶ 10; Docket No. 291 at ¶ 10).  BEO discharged impaired water into the S-Pit on more than 200 occasions during May 2012.  (Docket No. 268 at ¶ 11; Docket No. 291 at ¶ 11).

The EHB determined that it should assess a civil penalty in the amount of $1,137,295.76 against EQT for EQT's violations of the Pennsylvania Clean Streams Law.  (Docket No. 268 at ¶ 12; Docket No. 291 at ¶ 12).  The EHB included the following, in part, in its adjudication:

- "EQT engaged in a pattern of reckless behavior that culminated in the violations in this case."  (Docket No. 268 at ¶ 13; Docket No. 291 at ¶ 13; *see also* Docket No. 273 at 90).

- A heading on page four of the EHB's adjudication provides, "EQT Builds Its Impoundment with an Inadequate Subbase and Liner."  (Docket No. 268 at ¶ 14; Docket No. 291 at ¶ 14; *see also* Docket No. 273 at 6).

- "[T]he subbase was very irregular in thickness, but it nevertheless covered the bottom of the pit."  (Docket No. 268 at ¶ 15; Docket No. 291 at ¶ 15; *see also* Docket No. 273 at 7 (internal citation omitted)).

- "EQT did not screen the material used in the subbase to eliminate rocks."  (Docket No. 268 at ¶ 16; Docket No. 291 at ¶ 16; *see also* Docket No. 273 at 7).

- "The impoundment did not have a low permeability clay subbase."  (Docket No. 268 at ¶ 17; Docket No. 291 at ¶ 17; *see also* Docket No. 273 at 8).

- "EQT did not construct a proper subbase beneath the synthetic liner inside of its impoundment, which is an essential practice if the liner is to be secure and

7

protected. A 'clay-like material' that was insufficient in amount, not tested, and not screened or properly compacted was used and the material was unacceptably rocky. The subbase was not as hard, smooth, uniform, and free from debris, rock, or other material that could puncture, tear, cut or otherwise cause the liner to fail as it needed to be in order to comply with 25 Pa. Code § 78.56 and good design standards." (Docket No. 268 at ¶ 18; Docket No. 291 at ¶ 18; *see also* Docket No. 273 at 8).

- "The limestone screenings were apparent towards the west side of the impoundment along the liner/subbase interface. However, it appeared that little, if any, had been applied towards the center and east side of the impoundment." (Docket No. 268 at ¶ 19; Docket No. 291 at ¶ 19; *see also* Docket No. 273 at 8).

- "Photos showed the subbase to have protruding rocks." (Docket No. 268 at ¶ 20; Docket No. 291 at ¶ 20; *see also* Docket No. 273 at 8).

- "EQT's impoundment was completed in December 2011." (Docket No. 268 at ¶ 21; Docket No. 291 at ¶ 21; *see also* Docket No. 273 at 9).

- "The liner that EQT used was not designed, constructed, and maintained so that the liner was resistant to physical failure during handling, installation, and use." (Docket No. 268 at ¶ 22; Docket No. 291 at ¶ 22; *see also* Docket No. 273 at 9).

- A heading on page seven of the EHB's adjudication provides, "EQT was Conscious of the High Risk it was Creating by Building the Impoundment." (Docket No. 268 at ¶ 23; Docket No. 291 at ¶ 23; *see also* Docket No. 273 at 9).

- "EQT did not install anything at the S Pit impoundment to allow it to determine if

its liner had been compromised; there was no leak detection system." (Docket No. 268 at ¶ 24; Docket No. 291 at ¶ 24; *see also* Docket No. 273 at 13).

- "It is not clear exactly who caused the holes or how they were caused, in part because EQT often did not have any personnel supervising or observing activities on the site for several days to weeks at a time." (Docket No. 268 at ¶ 25; Docket No. 291 at ¶ 25; *see also* Docket No. 273 at 21).

- "A possible cause was hoses used for fluid transfer coming into contact with the inadequately protected liner." (Docket No. 268 at ¶ 26; Docket No. 291 at ¶ 26; *see also* Docket No. 273 at 21).

- "EQT did not take appropriate response actions quickly enough during its initial response to its leaking impoundment." (Docket No. 268 at ¶ 27; Docket No. 291 at ¶ 27; *see also* Docket No. 273 at 24).

- "[EQT's environmental consultant] was instructed by EQT to stand down (stop doing any work) between May 10 and May 21." (Docket No. 268 at ¶ 28; Docket No. 291 at ¶ 28; *see also* Docket No. 273 at 24).

- "During operations, EQT personnel had a limited presence on the site, which resulted in frequently inadequate oversight and supervision of its contractors relative to the impoundment." (Docket No. 268 at ¶ 29; Docket No. 291 at ¶ 29; *see also* Docket No. 273 at 25).

- "On May 31, the Department sent an email to EQT requesting an urgent meeting and asking EQT to submit a work plan on or before June 8 for characterizing the contamination at the site." (Docket No. 268 at ¶ 30; Docket No. 291 at ¶ 30; *see*

*also* Docket No. 273 at 25).

- "EQT responded that it was unwilling to meet with the Department at that time and that it would submit a work plan when it decided it was ready to do so." (Docket No. 268 at ¶ 31; Docket No. 291 at ¶ 31; *see also* Docket No. 273 at 25).

- "The Department is unaware of any other case before or since where an operator refused the Department's invitation to meet under similar circumstances." (Docket No. 268 at ¶ 32; Docket No. 291 at ¶ 32; *see also* Docket No. 273 at 25).

- "EQT believes that the newly discovered holes found in the floor and sidewall of the liner were most likely caused by Terra Services' treatment hoses." (Docket No. 268 at ¶ 33; Docket No. 291 at ¶ 33; *see also* Docket No. 273 at 27).

- "EQT cancelled [a] liner integrity evaluation on June 9, 2012." (Docket No. 268 at ¶ 34; Docket No. 291 at ¶ 34; *see also* Docket No. 273 at 28).

- "The record does not support a finding that the leaks from the impoundment were limited to the areas of the Terra Services and ATOS [EQT's contractor, Aquatic Transfer and Oilfield Solutions] activities because no full investigation was conducted or at least disclosed." (Docket No. 268 at ¶ 35; Docket No. 291 at ¶ 35; *see also* Docket No. 273 at 19, 28).

- "The concentration of contaminants (e.g. barium, strontium, chloride) in pre-excavation samples of the unconsolidated material below the liner but still inside the pit did *not* correlate with the area with the highest concentration of holes." (Docket No. 268 at ¶ 36; Docket No. 291 at ¶ 36; *see also* Docket No. 273 at 28 (emphasis in original)).

- "EQT's conduct with respect to the construction, operation, and closure of the impoundment and early remediation of the release was reckless." (Docket No. 268 at ¶ 37; Docket No. 291 at ¶ 37; *see also* Docket No. 273 at 40).

- "EQT failed to comply with the performance standards set forth in 25 Pa. Code Chapter 78 that require that, regardless of design, impoundments must not leak." (Docket No. 268 at ¶ 38; Docket No. 291 at ¶ 38; *see also* Docket No. 273 at 40).

- "EQT knew right away that the results were indicative of gas well operations." (Docket No. 268 at ¶ 39; Docket No. 291 at ¶ 39; *see also* Docket No. 273 at 41).

- "Over the course of the next six weeks, EQT slowly—too slowly in our view— confirmed that its impoundment had released many thousands of gallons of impaired water into the underground waters of the Commonwealth at the site." (Docket No. 268 at ¶ 40; Docket No. 291 at ¶ 40; *see also* Docket No. 273 at 41).

- "The Board itself actually determines exactly what the penalty should be." (Docket No. 268 at ¶ 41; Docket No. 291 at ¶ 41; *see also* Docket No. 273 at 42).

- "EQT did not construct a proper subbase or install a sturdy enough liner to withstand the abuse to which EQT put it. Given the photos we saw of the subbase, it is not difficult to imagine the rocky subbase caused other holes." (Docket No. 268 at ¶ 42; Docket No. 291 at ¶ 42; *see also* Docket No. 273 at 63).

- "Contaminants were found in the subbase at places as far as 100 feet away from the location of the holes attributed to Terra Services at higher levels than the contaminant levels found in the area of those holes." (Docket No. 268 at ¶ 43; Docket No. 291 at ¶ 43; *see also* Docket No. 273 at 63).

- "There was a disturbing history of rocks being found *on top of* the liner." (Docket No. 268 at ¶ 44; Docket No. 291 at ¶ 44; *see also* Docket No. 273 at 64 (emphasis in original)).

- "[I]n order to comply with Section 91.34(a), EQT needed to take necessary measures to prevent the impaired waters in its impoundment from 'directly or indirectly' reaching waters of the Commonwealth from any cause. EQT failed to do that. It failed to design and operate its impoundment in a way that prevented the impaired water in its impoundment from being released into the underground waters beneath the impoundment. Its culpability under Section 91.34(a) arises from the fact that it failed to install a proper subbase, or an adequate liner given the abuse to which the liner was going to be subjected. It failed to take necessary measures to prevent pollution by failing to properly manage hoses used in the impoundment. It failed to have adequate supervision and oversight at the site. It failed to have any system in place for detecting leaks. It failed to timely conduct an adequate emergency response once there was evidence that the impoundment was leaking. It failed to close the leaky impoundment in a timely manner. These failures directly and proximately resulted in polluting substances reaching waters of the Commonwealth." (Docket No. 268 at ¶ 45; Docket No. 291 at ¶ 45; *see also* Docket No. 273 at 70).

- "EQT failed to take necessary measures when it built its substandard impoundment in 2011, and its failure started causing pollution as early as April 30, 2012." (Docket No. 268 at ¶ 46; Docket No. 291 at ¶ 46; *see also* Docket No. 273 at 71).

12

- "We agree with the Department that EQT engaged in a pattern of reckless behavior that culminated in the violations in this case." (Docket No. 268 at ¶ 47; Docket No. 291 at ¶ 47; *see also* Docket No. 273 at 77).

- "EQT decided to tempt the fates. It built a pit to hold millions of gallons of impaired water from multiple well pads for long periods of time with only one liner and with no way to tell whether the pit was leaking." (Docket No. 268 at ¶ 48; Docket No. 291 at ¶ 48; *see also* Docket No. 273 at 77).

- "EQT says it built the impoundment in conformance with all regulatory design criteria. We disagree." (Docket No. 268 at ¶ 49; Docket No. 291 at ¶ 49; *see also* Docket No. 273 at 78).

- "Given the photographic and other evidence of record, we would not be surprised at all if the rocks caused holes, but the point here is that EQT did not comply with the regulations and it installed an improper subbase in an impoundment that would have been risky even if it had been constructed properly." (Docket No. 268 at ¶ 50; Docket No. 291 at ¶ 50; *see also* Docket No. 273 at 78).

- "Having constructed an impoundment with no leak detection system whatsoever, EQT needed to be extremely sensitive to any sign of a leak. We view EQT's initial response to the danger signs of such a leak to have been completely unacceptable." (Docket No. 268 at ¶ 51; Docket No. 291 at ¶ 51; *see also* Docket No. 273 at 79).

- "EQT inexplicably dragged its feet." (Docket No. 268 at ¶ 52; Docket No. 291 at ¶ 52; *see also* Docket No. 273 at 79).

- "EQT paid inadequate heed to the alarm bells that were going off." (Docket No.

268 at ¶ 53; Docket No. 291 at ¶ 53; *see also* Docket No. 273 at 80).

- "Remarkably, EQT continued to add water to the pit from April 30, 2012, when the first anomalous field sampling results were detected, until May 21, 2012." (Docket No. 268 at ¶ 54; Docket No. 291 at ¶ 54; *see also* Docket No. 273 at 80).

- "To have allowed a hazard to unfold in search of scientific certainty while it was busy fracking was inexcusable." (Docket No. 268 at ¶ 55; Docket No. 291 at ¶ 55; *see also* Docket No. 273 at 80).

- "EQT personnel and consultants conceded that they knew right away after the well samples came back that there could be a problem with the pit. EQT simply did not make addressing the problem a priority, and it bears repeating, it continued to fill the pit." (Docket No. 268 at ¶ 56; Docket No. 291 at ¶ 56; *see also* Docket No. 273 at 81).

- "EQT did not patch the hundreds of holes that were discovered in the pit until June 15 (after pressure washing the liner with the holes in it)." (Docket No. 268 at ¶ 57; Docket No. 291 at ¶ 57; *see also* Docket No. 273 at 81).

- "EQT at times seemed to exhibit an unhealthy disdain for the Department. While the Department sensed that a crisis was underway and asked EQT to meet and discuss the measures that were being taken to address that crisis, EQT simply refused to meet." (Docket No. 268 at ¶ 58; Docket No. 291 at ¶ 58; *see also* Docket No. 273 at 82).

- "The conduct that needs to be deterred is failing to build and operate storage facilities with great care, and failing to take necessary measures to prevent them

14

from leaking. Building and operating must be closely supervised from start to finish, which repeatedly did not happen here. EQT simply did not exercise enough oversight, supervision, and control over the construction and operation of its impoundment." (Docket No. 268 at ¶ 59; Docket No. 291 at ¶ 59; *see also* Docket No. 273 at 84).

- "In pits, an adequate subbase must be installed. Water should not be added or removed carelessly." (Docket No. 268 at ¶ 60; Docket No. 291 at ¶ 60; *see also* Docket No. 273 at 84).

- "It may be necessary to spend a few extra dollars for expedited samples. A potentially compromised pit should not continue to be filled." (Docket No. 268 at ¶ 61; Docket No. 291 at ¶ 61; *see also* Docket No. 273 at 84).

- "Rather than acknowledging that mistakes were made, EQT has offered any number of poor excuses. First, virtually everything is the fault of its contractors, even though EQT knows as the permittee it bears full responsibility." (Docket No. 268 at ¶ 62; Docket No. 291 at ¶ 62; *see also* Docket No. 273 at 85).

- "It would be inconsistent with the goals expressed in the Clean Streams Law to allow an operator such as EQT to hire contractors to perform virtually all of the activities on a site and then attempt to wash its hands of any liability by blaming everything on those contractors." (Docket No. 268 at ¶ 63; Docket No. 291 at ¶ 63; *see also* Docket No. 273 at 85).

- "The severe harm resulted from EQT's reckless conduct." (Docket No. 268 at ¶ 64; Docket No. 291 at ¶ 64; *see also* Docket No. 273 at 87).

- "The consequences of [EQT's] reckless conduct extended through September 27[, 2012]." (Docket No. 268 at ¶ 65; Docket No. 291 at ¶ 65; *see also* Docket No. 273 at 87).

EQT denies that the statements or any other findings or conclusions made by EHB are material to determining whether Terra caused the holes in the liner or whether EQT is entitled to recover the EHB Penalty, in whole or in part, from Terra as an element of damages in this litigation. (Docket No. 291 at ¶¶ 12-65). EQT further notes that it has filed a Petition for Review from the EHB's adjudication in which it disputes the EHB's underlying findings and conclusions in the EHB adjudication. (*Id.*).[1]

As to EQT's Concise Statement of Additional Material Facts in Opposition to Terra Services, LLC's Motion for Partial Summary Judgment, the following facts are not contested. EQT constructed the S-Pit during October and November in 2011. (Docket No. 291 at ¶ 1; Docket No. 296 at ¶ 1). Hawbaker Engineering, LLC designed the S-Pit, and Trumbull Corporation built it. (Docket No. 291 at ¶ 2; Docket No. 296 at ¶ 2). On or about November 4, 2011, Environmental Construction, Inc. supplied and installed a forty-mil linear low density polyethylene liner in the S-Pit. (Docket No. 291 at ¶ 3; Docket No. 296 at ¶ 3). Terra performed water treatment services at the S-Pit beginning on April 19, 2012, and concluding on April 24, 2012. (Docket No. 291 at ¶ 4; Docket No. 296 at ¶ 4). On April 30, 2012, EQT observed elevated levels of conductivity in groundwater monitoring wells that it had previously installed in the vicinity of the S-Pit. (Docket No. 291 at ¶ 5; Docket No. 296 at ¶ 5). Following the completion of Terra's water treatment work,

---

[1] The Court's review of the EHB's docket entries reveals that a petition has been filed and that the certified record was filed on August 4, 2017. No further updates as to the petition's current status are available.

EQT discovered hundreds of holes in the S-Pit liner.  (Docket No. 291 at ¶ 6; Docket No. 296 at ¶ 6).  The holes in the S-Pit liner caused leakage of impaired fluid from the S-Pit into surrounding land and water, resulting in contamination of the environment.  (Docket No. 291 at ¶ 7; Docket No. 296 at ¶ 7).

EQT has alleged that Terra violated the MSA by failing to use its best skill and judgment in discharging its obligations; failing to complete its water treatment work in a good workmanlike, safe, expeditious, and economic manner; failing to use the skill and judgment customarily used in its trade in performing its water treatment work and to complete it free from defects; improperly causing the S-Pit to sustain several hundred holes; and causing or permitting a violation of, or performing its water treatment work in a manner that subjected the well to remedial obligation under local, state, and/or federal environmental laws.  (Docket No. 291 at ¶ 8; Docket No. 296 at ¶ 8).  As noted above, on or about October 7, 2014, the DEP filed a complaint with the EHB for civil penalties against EQT.  (Docket No. 291 at ¶ 9; Docket No. 296 at ¶ 9).  On May 26, 2017, the EHB issued an adjudication assessing a $1,137,295.76 civil penalty against EQT.  (Docket No. 291 at ¶ 10; Docket No. 296 at ¶ 10).  On June 22, 2017, EQT filed a Petition for Review from the EHB's adjudication.  (Docket No. 291 at ¶ 11; Docket No. 296 at ¶ 11).

## III.    PROCEDURAL HISTORY

Terra filed its Motions for Partial Summary Judgment and supporting briefing on June 28, 2017, along with sealed supporting documents on June 29, 2017.  (Docket Nos. 626-274).  EQT filed its briefs in opposition and sealed supporting documents on July 28, 2017.  (Docket Nos. 281-292).  On August 11, 2017, Terra filed its replies and sealed supporting documents.  (Docket Nos. 293-298).  EQT filed its sur-replies and a sealed supporting document on August 25, 2017.

(Docket Nos. 299-301).  The Court heard oral argument on September 5, 2017.  (Docket Nos. 302, 303).  Subsequently, the parties filed their respective supplemental briefing on October 18, 2017.  (Docket Nos. 304, 305).

## IV.  LEGAL STANDARD

Summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility.  The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.  *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (citing *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor.  *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).  As to materiality, the relevant substantive law identifies which facts are material.

*Anderson*, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

## V.    DISCUSSION

### A.  Terra's Motion for Partial Summary Judgment as to EQT's Claim for Attorneys' Fees

Terra argues that EQT is not entitled to attorneys' fees for several reasons.  Terra first asserts that Section 14.1 of the MSA does not entitle EQT to attorneys' fees.  (Docket No. 271 at 5-7).  Section 14.1 of the MSA provides, in part, that "[Terra] shall indemnify and hold [EQT] harmless from any costs or damages caused by any breach by [Terra] of this Article including, but not limited to, citations, penalties or fines from any applicable governmental authority."  (Docket No. 274 at 66).  Relying upon supporting case law, Terra insists that the phrase "any costs or damages" in Section 14.1 does not encompass attorneys' fees.  (Docket No. 271 at 6-7).  Terra next argues that the express terms of the other inapplicable provisions of the MSA reinforce the proper interpretation of Section 14.1.  (*Id.* at 7-10).  Specifically, Terra maintains that because Section 6.2.4, Section 12.2, and Paragraph 8 of Schedule A of the MSA provide for the recovery of legal fees, Section 14.1 excludes the recovery of attorneys' fees.  Section 6.2.4 provides, in part, that "[Terra] shall be liable to [EQT] for all costs incurred as a result of accelerated or expedited methods in order to meet the original schedule completion dates, or otherwise mitigate any delay caused by such default and all legal fees and additional expenses incurred as a result of [Terra's] default." (Docket No. 274 at 62).  Section 12.2 states, in part, that "[Terra] shall defend, indemnify, and hold harmless [EQT] . . . from and against any and all claims, demands, causes of action, damages, liabilities, judgments, losses, fines, awards, penalties, costs and expenses, including

attorneys' fees and other costs of defense arising out of or resulting from any infringement or claim of infringement." (*Id.* at 65). Paragraph 8 of Schedule A provides that "[i]n the event [Terra] or its insurance carrier defaults on any obligation under this Schedule A or the policies required by this Schedule A, [Terra] agrees that it will be liable for all reasonable expenses and attorneys' fees incurred by [EQT] to enforce the provisions of this Schedule A or of the policies." (*Id.* at 74). Terra argues that the absence of the terms "attorneys' fees," "legal fees," or "costs of defense" in Section 14.1 establishes that the same does not include attorneys' fees. (Docket No. 271 at 10).

In response, EQT asserts that the mere fact that the phrase "attorneys' fees" does not appear in the MSA does not prevent the Court from finding that there was a valid, enforceable agreement to assess the same. (Docket No. 287 at 16). EQT points out that Section 14.1 states that "[Terra] shall not cause or permit a violation of, or perform Project Work in a manner that will subject the Project site to any remedial obligation under any local, state or federal environmental laws." (Docket No. 274 at 66). EQT contends that, as a result, "[t]he only logical interpretation of a provision referencing violations of laws and regulations is that the remedy therefore would involve the defense of legal proceedings." (Docket No. 287 at 16). In reply, Terra counters that EQT has failed to offer any support or analysis for its conclusory assertion and argues that "remedial obligation" involves clean-up of the site, not the defense of legal proceedings. (Docket No. 298 at 4). Terra maintains that because Section 14.1 is clear and unequivocal, it must be strictly construed against EQT as the drafter of the MSA. (*Id.* at 3). In its sur-reply, EQT contends that its remedies are not limited to those available in Section 14.1 because its claims against Terra are based upon its breach of multiple Articles of the MSA. (Docket No. 301 at 5).

Terra also argues that EQT's alleged attorneys' fees are not consequential damages. (Docket No. 271 at 10-11). Terra asserts that the American Rule applies to EQT's request for fees because there are no statutes, agreements, or exceptions creating an entitlement to attorneys' fees. (*Id.*). In response, EQT contends that the American Rule does not bar recovery of fees and costs incurred in actions brought by third parties. (Docket No. 287 at 10-11). Relying upon Section 334 of the Restatement of Contracts, EQT maintains that attorneys' fees are recoverable because Terra's breach of contract is the cause of litigation between EQT and third parties and because Terra had reason to foresee such litigation when the contract was signed. (*Id.* at 11-13). EQT further argues that the record demonstrates the foreseeability of a DEP enforcement action because Terra understood that its hoses could tear the S-Pit liner and cause a leak. (*Id.* at 14). In reply, Terra contends that Section 334 is inapplicable because comment "a" provides that it does not apply to the interpretation of express contracts of indemnity, and EQT relies upon Section 14.1 of the MSA, which is an express contract of indemnity, to recover attorneys' fees. (Docket No. 298 at 7-8). In its sur-reply, EQT argues that comment "a" to Section 334 has not been adopted by any courts in Pennsylvania and that the MSA is not an indemnity agreement. (Docket No. 301 at 4-5). EQT maintains that because its claims against Terra are based upon breaches of multiple articles of the MSA, its remedies are not limited to those included in Article 14. (*Id.* at 5).

Generally, Pennsylvania state courts follow the American Rule in determining whether to award attorneys' fees in a given case. "'[U]nder the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception.'" *Sayler v. Skutches*, 40 A.3d 135, 140 (Pa. Super. Ct. 2012) (quoting *Trizechahn Gateway LLC v. Titus*, 976

A.2d 474, 482-83 (Pa. 2009)). EQT's claims against Terra rely upon the MSA, and none of the other recognized exceptions to the "American Rule" are relevant here. Therefore, consistent with Pennsylvania law, it is EQT's burden to demonstrate that the MSA constitutes "a clear agreement" between EQT and Terra as to attorneys' fees. *In re Farnese*, 17 A.3d 357, 370 (Pa. 2011). The Supreme Court of Pennsylvania has also clarified that the mere fact that a written contract contains an ambiguity does not, by itself, dictate whether such an agreement may constitute a "clear agreement of the parties" because Pennsylvania contractual principles permit the introduction of extrinsic and parole evidence to define ambiguous terms. *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 482-83 (2009). To the extent that such evidence is to be considered, EQT retains the burden to demonstrate that a clear agreement of the parties as to attorneys' fees was consummated. *Id.*

Pennsylvania rules of contract interpretation require this Court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Id.* "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* (internal quotations omitted). If the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.* To this end, Pennsylvania courts generally enforce the unambiguous terms of agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. *See McMullen v. Kutz*, 985 A.2d 769, 778 (Pa. 2009) ("[F]reely negotiated agreements entered into at arm's length

are generally enforced according to their terms to allow parties the benefit of their bargains."); *see also John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 708 (Pa. Super. Ct. 2003) ("[C]ourts should not [generally] set aside terms on which sophisticated parties agreed.").

Importantly, as both parties acknowledge, there are no provisions set forth in Section 14.1 of the MSA which expressly state that the parties agreed that Terra would be liable for attorneys' fees. (*See* Docket No. 274 at 66). The absence of such express language in an agreement between two sophisticated entities, each represented by able counsel, strongly suggests that the parties had not agreed to the coverage of attorneys' fees. *See McMullen*, 985 A.2d at 778. The Court's opinion is fully supported by the other provisions in the MSA because, as Terra has pointed out, Section 6.2.4, Section 12.2, and Paragraph 8 of Schedule A of the MSA expressly provide for the recovery of legal fees. (*Id.* at 62, 65, 74). Indeed, as Terra has emphasized, Section 14.1 provides for the recovery of "any costs or damages." (Docket No. 274 at 66). From this language, the Court concludes that, consistent with Pennsylvania law, attorneys' fees are not included in Section 14.1. *See, e.g.*, *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 520 (3d Cir. 2012) ("The 'cost of the proceedings involved in the suit' includes 'court reporter's, arbitrator's, and mediator's fees,' not attorneys' fees. Attorneys' fees traditionally are distinguished from costs."); *48-50 Enters. v. Rimmeir*, No. 01-775, 2002 Bankr. LEXIS 1623, at *19-25 (Bankr. E.D. Pa. Dec. 31, 2002) (holding that a broad provision for recovery of "any and all damages, costs, and expenses" was insufficient for the recovery of attorneys' fees).

The remaining language in Section 14.1 also supports the Court's conclusion, as it provides for costs or damages caused by any breach by Terra "including, but not limited to, citations, penalties or fines from any applicable governmental authority." (Docket No. 274 at 66). Such

language does not contemplate attorneys' fees. *See, e.g.*, *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 805 (Pa. 1996) ("It is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples."); *cf. Sloan & Co. v. Liberty Mut. Ins. Co.*, 653 F.3d 175, 186-87 (3d Cir. 2011) (holding that the term "expenses and costs" included attorneys' fees and other litigation-related expenses and costs when used "in a paragraph *discussing procedural mechanisms for lawsuits and other dispute resolution proceedings*") (emphasis added). Although the language of the MSA is clear and unambiguous, the Court notes that it would construe ambiguous language against EQT as the drafter of the agreement. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 418 (3d Cir. 2011). Accordingly, the Court concludes that there is no express provision in Section 14.1 of the MSA providing for the recovery of attorneys' fees.

Moving on to the parties' arguments with respect to consequential damages, the Court finds that summary judgment is precluded. Section 351 of the Restatement (Second) of Contracts provides:

§ 351 Unforeseeability and Related Limitations on Damages

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
  (a) in the ordinary course of events, or
  (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.
(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.

24

RESTATEMENT (SECOND) OF CONTRACTS § 351. Section 334 of the Restatement of Contracts states that "[i]f a breach of contract is the cause of litigation between the plaintiff and third parties that defendant had reason to foresee when the contract was made, the plaintiff's reasonable expenditures in such litigation are included in estimating his damages." RESTATEMENT OF CONTRACTS § 334. Section 334 has been incorporated as comment "c" to Section 351 of the Restatement (Second) of Contracts, which provides:

> c. Litigation or settlement caused by breach. Sometimes a breach of contract results in claims by third persons against the injured party. The party in breach is liable for the amount of any judgment against the injured party together with his reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract. This is so even if the judgment in the litigation is based on a liquidated damage clause in the injured party's contract with the third party. A failure to notify the party in breach in advance of the litigation may prevent the result of the litigation from being conclusive as to him. But to the extent that the injured party's loss resulting from litigation is reasonable, the fact that the party in breach was not notified does not prevent the inclusion of that loss in the damages assessed against him. In furtherance of the policy favoring private settlement of disputes, the injured party is also allowed to recover the reasonable amount of any settlement made to avoid litigation, together with the costs of settlement.

RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. c (internal citations omitted).

Courts in Pennsylvania have consistently held that a party may seek recovery of legal expenses incurred in third-party litigation. *See C. J. Langenfelder & Son, Inc. v. Commonwealth, Dep't of Transp.*, 44 Pa. Commw. 585, 599 (Pa. Commw. Ct. 1979) (explaining that attorneys' fees are recoverable under Section 334 of the Restatement of Contracts "when the breach of contract caused the litigation in which the expenses incurred"); *Millette v. Barrett*, 1962 Pa. Dist. & Cnty. Dec. LEXIS 89, at *5-8 (Pa. C.P. 1962) (holding that attorneys' fees incurred in a suit with a third party were recoverable under Section 334 of the Restatement of Contracts); *see also River Gap Builders v. Tomasello*, 2007 Pa. Dist. & Cnty. Dec. LEXIS 486, at *2 (Pa. C.P. 2007)

("[W]here the claim for attorney's fees arises from a matter ancillary to but arising out of the claimant's dispute, such a claim is cognizable under the theory that such expenses are recoverable as consequential damages."); *Commonwealth, Dep't of Revenue, Bureau of State Lotteries v. Irwin*, 82 Pa. Commw. 266, 271 (Pa. Commw. Ct. 1984) ("[L]itigation expenses incurred in a third party suit may be recovered in an action for breach of contract if the defendant had reason when the contract was made to foresee that a breach would cause the litigation."). The parties dispute whether courts in Pennsylvania have followed comment "c" to Section 351 of the Restatement (Second) of Contracts. However, the Eastern District followed comment "c" in *Krupp v. Lincoln University*, 663 F. Supp. 289, 293-94 (E.D. Pa. 1987). Further, as noted above, Pennsylvania has expressly adopted Section 334 of the Restatement of Contracts.

The Court finds meritless Terra's argument that Section 334 of the Restatement of Contracts is inapplicable because comment "a" provides that Section 334 does not apply to the interpretation of express contracts of indemnity. As EQT has pointed out, no Pennsylvania court has adopted comment "a" to Section 334 of the Restatement of Contracts. Further, the MSA as a whole is not an indemnity agreement. Rather, it is an agreement between EQT and Terra for Terra's services. The Court also finds inapposite the cases upon which Terra relies in support of its argument that consequential damages are inapplicable. Specifically, while *PODS Enterprises, LLC v. Almatis, Inc.*, No. 16-CV-993, 2016 U.S. Dist. LEXIS 178580 (W.D. Pa. Dec. 27, 2016) and *Lewis v. Delp Family Powder Coatings, Inc.*, No. 08-CV-1365, 2011 U.S. Dist. LEXIS 34908 (W.D. Pa. Mar. 31, 2011), included a discussion of third-party litigation costs, the cases do not apply to the instant matter because the court in each case dismissed the plaintiff's claim for attorneys' fees after finding that it had failed to provide a basis upon which to recover the fees.

*PODS Enterprises, LLC*, 2016 U.S. Dist. LEXIS 178580, at *10; *Lewis*, 2011 U.S. Dist. LEXIS 34908, at *21.  Here, in contrast, EQT has provided a legal and factual basis upon which to recover attorneys' fees.  Indeed, it is well settled that "the award of consequential damages is factually intensive under Pennsylvania law."  *SMS Demag, Inc. v. ABB Transmissone & Distribuzone, S.P.A.*, No. 05-CV-466, 2008 U.S. Dist. LEXIS 25637, at *45 n.16 (W.D. Pa. Mar. 31, 2008).  Given Terra's admissions that it recognized the importance of protecting the integrity of water impoundment liners; that its work at the S-Pit preceded EQT's discovery of holes in the liner; and that the holes in the S-Pit liner caused some leakage of impaired fluids from the S-Pit into surrounding land and water, (Docket No. 288 at ¶¶ 7-10; Docket No. 294 at ¶¶ 7-10), the trier of fact could determine that EQT's damages in the EHB Proceeding were foreseeable under Section 334 of the Restatement of Contracts.  Thus, because there are issues of fact as to whether EQT's damages in the EHB Proceeding were foreseeable, the Court will deny Terra's Motion for Partial Summary Judgment as to EQT's Claim for Attorneys' Fees.

### B.  Terra's Motion for Partial Summary Judgment as to EQT's Civil Penalty Claim

Terra argues that EQT may not recover the civil penalty either as damages or as an element of indemnification.  (Docket No. 272 at 9-13).  Specifically, Terra asserts that EQT is precluded from challenging the EHB's determinations on the basis of the doctrine of res judicata.  (*Id.* at 9-12).  Terra also contends that EQT's common law indemnification claim fails because the EHB found that EQT's own conduct caused or contributed to the civil penalty.  (*Id.* at 12-13).  In response, EQT argues that the EHB adjudication is inadmissible hearsay.  (Docket No. 290 at 6-7).  EQT also asserts that the doctrine of res judicata is inapplicable because the issues considered by the EHB are not identical to the issues presented in the instant matter.  (*Id.* at 7-12).  EQT

contends that the penalty imposed by the EHB is a consequential damage because the same was foreseeable at the time the parties entered the MSA. (*Id.* at 12-14). As to its contractual indemnity claim, EQT insists that pursuant to Section 14.1 of the MSA, Terra would be liable for the burden of damages flowing from its conduct. (*Id.* at 14-15). In reply, Terra counters that because EQT seeks to introduce the penalty assessed by the EHB as an element of damages, it may not exclude from evidence the document that assesses and explains the penalty. (Docket No. 297 at 2-3). Terra maintains that the doctrine of collateral estoppel applies to the penalty assessed by EHB. (*Id.* at 5-6). Terra contends that the penalty assessed by the EHB does not constitute a consequential damage because EQT must prove that Terra's breach caused the penalty. (*Id.* at 7). In its sur-reply, EQT argues that the EHB's findings are inadmissible hearsay because Terra will offer the same for the purpose of their truth. (Docket No. 300 at 3-4).

"Res judicata bars a party from initiating a subsequent suit against the same adversary based on the same cause of action as a prior suit." *Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*, 726 F.3d 387, 394 (3d Cir. 2013). For a res judicata defense to succeed, the proponent must establish that: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Id.* (internal quotations omitted). Identifying a "cause of action" for res judicata purposes turns on the "essential similarity of the underlying events giving rise to the various legal claims." *Id.* (internal quotations omitted). The parties dispute whether the instant action is based upon the EHB's adjudication.

Although there is no simple test to be used in determining what constitutes a cause of action for res judicata purposes, a court looks "to whether there is an 'essential similarity of the

underlying events giving rise to the various legal claims,'" rather than the specific legal theory involved. *Corestates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir. 1999) (quoting *United States v. Athlone Indus.*, 746 F.2d 977, 984 (3d Cir. 1984)); *see also Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991) (explaining that "the term 'cause of action' cannot be precisely defined, nor can a simple test be cited for use in determining what constitutes a cause of action for res judicata purposes") (internal quotations omitted); *Davis v. United States Steel Supply, Div. of United States Steel Corp.*, 688 F.2d 166, 171 (3d Cir. 1982) (noting that res judicata does not rest on "the specific legal theory invoked"). This principle is "in keeping with 'the present trend . . . of requiring that a plaintiff present in one suit all the claims for relief that he may have arising out of the same transaction or occurrence.'" *Athlone*, 746 F.2d at 984 (quoting JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.410 (2d ed. 1983)).

In examining whether there is "an essential similarity of the underlying events," factors to be considered include "'whether the acts complained of were the same, whether the material facts alleged in each suit were the same, and whether the witnesses and documentation required to prove such allegations were the same.'" *Lubrizol*, 929 F.2d at 963 (quoting *Athlone*, 746 F.3d at 984). Mere reliance on different statutes in each action, the assertion of different theories of recovery, or the request for different forms of relief does not, in and of itself, render a party's claims different causes of action for res judicata purposes. *See Athlone*, 746 F.2d at 984; *see also Seamon v. Bell Telephone Co.*, 576 F.Supp. 1458, 1460 (W.D. Pa. 1983) ("[Res judicata] will operate to bar not only identical repetitive suits, but also to prevent the assertion of a different legal theory which arises from the same liability creating conduct, and which the party had reasonable opportunity to present in the original suit.").

Here, it is clear that the EHB solely adjudicated the assessment of a civil penalty as to EQT. The EHB did not address the culpability of EQT's contractors. Indeed, the EHB stated that "EQT, as the permittee, was responsible for the acts of its contractors and subcontractors." (Docket No. 273 at 90). The EHB also stated that "[t]he real issue in dispute in this case with respect to liability is not whether EQT has some liability; the issue is the *duration* of that liability." (*Id.* at 47 (emphasis in original)). Thus, the issue of Terra's potential liability has not been decided. The Court's conclusion is further supported by Third Circuit case law. *See, e.g.*, *Athlone*, 746 F.2d at 986-87 (holding that an action filed by the Consumer Product Safety Commission and a subsequent civil penalty action "involved different statutes, different acts, different wrongs, and necessitated different evidence to support the different material facts alleged" and finding that the District Court had erred by granting summary judgment on the basis of res judicata); *see also Dici v. Pennsylvania*, 91 F.3d 542 (3d Cir. 1996) (holding that a state administrative agency's determination in a worker's compensation hearing did not preclude a subsequent claim of Title VII discrimination); *Baughman v. Bradford Coal Co.*, 592 F.2d 215 (3d Cir. 1979) (holding that the EHB is not a court and that the District Court had jurisdiction despite the EHB's earlier assessment of civil penalties against the defendant); *United States v. Pa. Envtl. Hearing Bd.*, 377 F. Supp. 545 (M.D. Pa. 1974) (refusing to decline jurisdiction where the EHB allowed civil penalties against the United States for violations of the Clean Stream Law and the United States sought a declaration that the civil penalties were invalid).

Without providing any persuasive authority, EQT argues that EHB's adjudication cannot be offered for its truth. (Docket No. 290 at 6-7; Docket No. 300 at 4-5). As Terra notes, EQT cannot introduce the EHB adjudication as an element of its damages and also seek to exclude the

explanation of the penalty. *Builders Supply Co. v. McCabe*, 77 A.2d 368, 372 (Pa. 1951) ("Having, therefore, in the present action, placed the record of the Ohio suit in evidence for the purpose of proving that judgment was obtained against it for the sum now claimed, it cannot repudiate the basis, shown in the record, on which that judgment was recovered; to allow it to do so would be to permit it to recover from defendant because of a judgment which, in would now be obliged to assert, was incorrect and unjust and based upon a false finding of fact."). Further, while EQT's argument would be better addressed as a motion in limine, the EHB's adjudication will likely be admissible. *See, e.g.*, *Zeus Enters. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 243 (4th Cir. Va. Aug. 17, 1999) (holding that an ALJ's decision was admissible hearsay under Federal Rule of Evidence 803(8)(C)).

### C. Issues Raised at Oral Argument

At oral argument on September 5, 2017, the parties agreed to file supplemental briefing with respect to two issues: (1) whether public policy considerations permit penalties to be passed off and (2) whether an entity can be indemnified where it engaged in reckless, willful, or wanton conduct. (Docket No. 302; Docket No. 303 at 21-26). Having considered the parties' supplemental briefing, and having conducted its own independent research, the Court finds that Terra's motion must be denied. (Docket Nos. 304, 305).

With respect to the second issue, Terra argues that EQT may not seek indemnification for its own recklessness. (Docket No. 305 at 6-8). In its supplemental brief, EQT states that it "is *not* seeking indemnity for damages caused by its own conduct, reckless or otherwise. EQT is only seeking to recover those damages that were the direct and foreseeable result of Terra's breach of

the [MSA]." (Docket No. 304 at 5 (emphasis in original)). Given EQT's clarification, the Court finds that the second issue is now moot.

With respect to the first issue, it is well settled that "'[t]he public policy of the government is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials." *Simmons v. United States*, 120 F. Supp. 641, 648 (M.D. Pa. 1954) (quoting *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 340 (1897)). The purpose of the Clean Streams Law provides:

> (1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;
> (2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;
> (3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;
> (4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and
> (5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control.

35 Pa.C.S. § 691.4.

Without providing persuasive authority, Terra submits that "[a]llowing a company like EQT to pass off its civil penalty obligations when it violates the Clean Streams Law would obstruct the express goal of the Clean Streams Law to protect Pennsylvanians and their water resources." (Docket No. 305 at 3). The cases upon which Terra primarily relies are outside this Court's jurisdiction, do not interpret Pennsylvania's Clean Streams Law, and are distinguishable. (*Id.* at 3-4 (citing *United States v. B.P. Exploration & Prod. Inc.*, 753 F.3d 570 (5th Cir. 2014); *In re Oil Spill by the Oil Rig*, 841 F. Supp. 2d 988 (E.D. La. 2012); *Chevron Pipe Line Co. v. PacifiCorp*, No. 12-CV-287, 2017 U.S. Dist. LEXIS 11778 (D. Utah Jan. 27, 2017)). In *B.P. Exploration*, the

Fifth Circuit did not address any public policy considerations, and the issue in the case was whether statutory liability should be shifted in its entirety to the third party, not whether damages could be recovered from the third party. 753 F.3d at 575 (finding that the federal Clean Water Act "leaves no room for civil-penalty defendants to shift liability via allegations of third-party fault"). In *In re Oil Spill by the Oil Rig*, the Eastern District of Louisiana applied an indemnity provision, not provisions in a contract like the MSA at issue. 841 F. Supp. 2d at 994-97. Further, the public policy considerations in the case focused upon indemnification for gross negligence, which is not an issue in this matter because EQT does not seek indemnification for damages caused by its own gross negligence but, rather, seeks to recover damages that were the direct and foreseeable consequence of Terra's alleged breach of contract. *Id.* at 998-1003. Finally, *Chevron Pipe Line Co.* is inapplicable because, unlike the circumstances here, the plaintiff had no contractual relationship with the third party and, therefore, could not recover contribution. 2017 U.S. Dist. LEXIS 11778, at *10 (finding that the plaintiff's claim was "essentially a claim for contribution under tort law").

As EQT argues, "[t]here is no public policy recognized by the Pennsylvania courts or [legislation] that prevents Terra from being held responsible for a civil penalty that [may be] the direct and proximate result of its breach of contract." (Docket No. 304 at 2). There is, however, clear law favoring the enforcement of contracts. Indeed, it is well settled that "[p]ublic policy favors the validity of contracts freely entered into." *De Angelis v. Scott*, 337 F. Supp. 1021, 1024 (W.D. Pa. 1972); *see also Yellowbook Inc. v. Always in Serv.*, No. 11-CV-4526, 2013 U.S. Dist. LEXIS 113078, at *24 (E.D. Pa. Aug. 12, 2013) ("[P]ublic policy favors freedom of contract, which presupposes that individuals are capable of entering into and fulfilling their own

agreements.") (citing *Dep't of Transp. v. Paoli Const. Co.*, 386 A.2d 173, 175 (Pa. Commw. Ct. 1978)); *McMullen*, 985 A.2d at 778 ("[F]reely negotiated agreements entered into at arms length are generally enforced according to their terms to allow parties the benefit of their bargains."); *Simmons*, 120 F. Supp. at 648 (stating that "[o]nly in clear cases may a contract be declared illegal" as in violation of public policy). To this end, it is similarly well settled that Pennsylvania courts generally enforce the unambiguous terms of agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. *See, e.g.*, *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 840-41 (Pa. Super. Ct. 2006) (explaining that "[t]he stated policy of our Supreme Court is to enforce clear contract language" and that Pennsylvania courts enforce the plain language of contracts between sophisticated commercial entities because such parties are fully capable of fairly negotiating the terms of the contracts with the benefit of legal counsel); *John B. Conomos, Inc.*, 831 A.2d at 708 ("[C]ourts should not [generally] set aside terms on which sophisticated parties agreed.").

Terra contends that EQT should not be permitted to recover its civil penalty obligations as a matter of public policy based upon "'legal precedents, governmental practice, or obvious ethical or moral standards.'" (Docket No. 305 at 4 (quoting *Tayar v. Camelback Ski Corporation*, 47 A.3d 1190, 1199 (Pa. 2012)). (Docket No. 305 at 4). In *Tayar*, the Supreme Court of Pennsylvania stated that "avoidance of contract terms on public policy grounds requires a showing of *overriding public policy* from legal precedents, governmental practice, or obvious ethical or moral standards." 47 A.3d at 1199 (emphasis added). Here, as discussed above, Terra has not cited *any* Pennsylvania legal precedent, governmental practice, or obvious ethical or moral standard that would preclude

EQT from potentially recovering a civil penalty that may be the direct and proximate result of Terra's breach of contract.[2]

The other Pennsylvania case law upon which Terra relies is inapplicable to instant facts. (Docket No. 305 at 5). Specifically, Terra cites to case law for the general proposition that individuals cannot "'abridge police powers which protect the general welfare and public interest.'" (*Id.* (quoting *Carlino v. Whitpain Investors*, 453 A.2d 1385 (Pa. 1982), and citing *Mun. Auth. of Blythe v. Pa. Pub. Util. Comm'n*, 185 A.2d 628 (Pa. Super. Ct. 1962); *Takacs v. Indian Lake Borough Zoning Hearing Bd.*, 11 A.3d 587 (Pa. Commw. Ct. 2010), for same)). The cases to which Terra cites are unpersuasive, as *Carlino* and *Takacs* related to illegal contract zoning and *Municipal Authority of Blythe* involved the issue of whether charges made by a borough for furnishing water beyond its corporate limits constituted "rates" that were within the jurisdiction of the Public Utility Commission. Terra also relies upon *Central Dauphin School District v. American Casualty Co.*, 426 A.2d 94 (Pa. 1981), in support of its argument that an agreement "is unenforceable on grounds of public policy if *legislation provides that it is unenforceable* or if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." (*Id.* (emphasis added)). As the Court has discussed, there is no legislation providing that EQT is precluded from potentially recovering the civil penalty.

Further, Terra primarily argues that "[a]llowing EQT to pass off the EHB Penalty to Terra would defeat [the Clean Streams Law's] purpose, particularly where EQT's pattern of reckless

---

[2] To this end, the jury will weigh EQT's and Terra's conduct and make the determination as to whether the penalty is ultimately Terra's to bear. *See, e.g.*, *Windsor Shirt Co. v. New Jersey Nat'l Bank*, 793 F. Supp. 589, 595 (E.D. Pa. 1992) ("The jury must weigh the evidence, if the evidence is in dispute, because 'evaluation of witness credibility is the exclusive function of the jury.'") (quoting *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258 (3d Cir. 1987)); *see also Phinizy v. Pharmacare*, 569 F. Supp. 2d 512, 517 (W.D. Pa. 2008) ("[C]ourts may not invade the jury's province by making credibility determinations or weighing the evidence.").

conduct, as adjudicated by the EHB, formed the basis for the EHB Penalty." (*Id.* at 6). As previously explained, EQT does not seek indemnity for damages caused by its own reckless conduct but, rather, seeks to recover only those damages that were the direct and foreseeable result of Terra's breach of the MSA. Accordingly, the Court concludes that public policy considerations do not prevent EQT from seeking the recovery of the civil penalty that may be the direct and proximate result of Terra's breach of contract.

## VI.    CONCLUSION

Based on the foregoing, Terra's Motion for Partial Summary Judgment as to EQT's Claim for Attorneys' Fees and Terra's Motion for Partial Summary Judgment as to EQT's Civil Penalty Claim, (Docket Nos. 262, 266), will be DENIED. An appropriate Order follows.


*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record.